UNITED STATES OF AMERICA, ex rel. LEO
DANIELIDES, and LEO DANIELIDES,
individually,

        Plaintiffs,

        v.

NORTHROP GRUMMAN SYSTEMS
CORPORATION,

        Defendant.

No. 09 CV 7306

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

The United States hired Northrop Grumman Systems Corporation to work on a project named "Counter-MANPADS." The project aimed to protect civilian aircraft from missile attacks. Leo Danielides, a former Northrop employee, alleges that Northrop made false representations to obtain payments from the government. Danielides sued Northrop, on behalf of the United States, under the False Claims Act. Northrop moved to dismiss the complaint under Rules 9(b) and 12(b)(6). For the reasons discussed below, that motion is granted in part and denied in part.

## I.    Legal Standards

### A.  Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, I must construe the complaint in the light most favorable to Danielides, accept as true all well-pleaded facts, and draw reasonable inferences in his favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Statements of law, however, need not be accepted

as true. *Id*. Rule 12(b)(6) limits my consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive Northrop's motion, the complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Yeftich*, 722 F.3d at 915 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### B. The False Claims Act

Under the False Claims Act, private individuals (called "relators") may file civil actions on behalf of the United States, to recover money that the government paid as a result of the defendant's fraud. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011) (internal citation omitted). "As an incentive to bring suit, a prevailing relator may collect a substantial percentage of any funds recovered for the benefit of the government." *Id*. (internal citation omitted). To succeed on an FCA claim, "a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id*.

FCA claims must meet the higher pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Gross v. AIDS Research*

*Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) discourages a "sue first, ask questions later" approach by requiring that the complaint describe the who, what, when, where, and how of the fraud. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013).

## II.   Facts[1]

### A. Counter-MANPADS Background

In the fall of 2002, the Department of Homeland Security engaged Northrop to work on the Counter-MANPADS project, which aimed to protect civilian aircraft from shoulder-fired missile attacks. FAC ¶¶ 1–2. Northrop had already designed a missile-defense system for the military, and was to adapt that system to serve civilian aircraft. FAC ¶¶ 1, 32. Northrop worked on three phases of the project: in phase one, Northrop performed initial design and development work. FAC ¶ 2. In phase two, Northrop built and tested a prototype system and obtained regulatory certification to install that system on commercial aircraft. FAC ¶ 2. In phase three—which is the subject of Danielides's complaint—Northrop tested the system to identify and correct its failures. FAC ¶¶ 2–3.

Although each phase was separately bid and negotiated (FAC ¶ 28), Northrop's performance on phases one and two was the deciding factor in DHS's

---

[1] The facts are taken from the first amended complaint [28], which is cited as "FAC."

decision to award phase three to Northrop (FAC ¶¶ 4, 50). Substantially the same contract structure, language, terms, and conditions were used for phase three as had been used in phases one and two. FAC ¶¶ 4, 37. The phase three contract was a series of modifications to the contracts that governed phases one and two. FAC ¶ 4.

Throughout the relevant periods, relator Danielides was a Program Manager on the project. FAC ¶ 25. The Program Director for phases one and two was John Stanfill. FAC ¶ 8. After phase two, Stanfill was replaced by David Denton. FAC ¶ 8. Danielides alleges that Denton was primarily responsible for the fraud that is the subject of this lawsuit. FAC ¶¶ 8, 51.

### B. The "Fixed Price Best Efforts" Contract

The phase three contract referred to itself as a "fixed price best efforts" agreement, and tied the government's payment obligations to Northrop's achievement of certain "milestones." Specifically, the contract stated that "[t]he Agreement is a fixed price best efforts agreement with payments based on milestone payments which will be made only upon the completion of the acceptance criteria outlined in Attachment 3 as accepted by the Government." [49-1] art. VI, § A.1. Other contract provisions relevant to the milestone payments are:

- "Northrop Grumman shall perform the work as specified in the SOW [Statement of Work] (Attachment 1) and as outlined in the TDD [Task Description Document] (Attachment 2). Northrop Grumman shall be paid for each Payable Milestone accomplished and delivered in accordance with the Schedule of Payments, Accomplishment Criteria and Payable Milestones set forth in Attachment 3, Payable Milestones Schedule." [49-1] art. IV, § A.

- "Northrop Grumman shall document the accomplishments of each Payable Milestone by submitting or otherwise providing the Payable Milestones Report." [49-1] art. VI, § B.1.

4

- "Payments shall be made in the amounts set forth in Schedule of Payments and Payable Milestones, provided the OTCOTR [Other Transaction Contracting Officers Technical Representative] has verified the accomplishment of the Payable Milestones in accordance with the acceptance criteria." [49-1] art. VI, § B.3.

- "Northrop Grumman's relevant financial records associated with this Agreement are not subject to examination or audit by the Government, except as noted below,[2] since the confirmed accomplishment of the appropriate milestone completes the obligation of Northrop Grumman's correspondent obligation." [49-1] art. VI, § B.5.

The government had the authority to terminate the contract if the project was not expected to produce beneficial results. Specifically, the contract stated that "[s]ubject to a reasonable determination that the program will not produce beneficial results commensurate with the expenditure of resources, the Government may terminate this Agreement by written notice to Northrop Grumman, provided that such written notice shall be preceded by consultation between the Parties." [49-1] art. II, § B. If the agreement were so terminated, the parties were to "negotiate in good faith" concerning "equitable compensation to Northrop Grumman for work performed up to the date of termination . . . ." [49-1] art. II, § B.

Danielides was present during the contract's negotiation. FAC ¶ 52. He alleges that the "best efforts" language—in the contract's description of itself as a "fixed price best efforts" agreement—was insisted upon by Northrop so that it wouldn't face "unquantifiable risk." FAC ¶ 53. According to Danielides, the parties "agreed and understood that Northrop's best efforts could be objectively measured by the money it spent on particular tasks and the contract as a whole, as compared

---

[2] The exception relates to the Comptroller General's access, and is not relevant here.

to the budgeted costs." FAC ¶ 6. Thus Danielides alleges, "[b]oth Northrop and the government understood" that the "best efforts" requirement meant that "Northrop must either complete the contract objectives or expend budgeted costs in a legitimate effort to do so." FAC ¶¶ 39, 53.

### C. Alleged False Claims Concerning Northrop's "Best Efforts"

#### 1. Northrop Promised to Exert its Best Efforts, but Never Intended to Do So.

According to Danielides, Northrop never intended to exert its best efforts, even as it promised to do so during the negotiation of the phase three contract. FAC ¶ 55. Danielides alleges that during negotiations for all phases of the program, Northrop provided DHS with detailed budgets showing its expected cost for each task. FAC ¶¶ 6, 42. And during performance of the contract, Northrop was required to provide detailed cost and schedule data. FAC ¶¶ 6, 41–42, 44–46. Danielides alleges that Northrop provided that cost and schedule data in phases one and two, but stopped doing so at the start of phase three. FAC ¶ 46. Allegedly, "[t]his was done to conceal Northrop's failure to expend sufficient effort to perform" its obligations. FAC ¶ 46; *see also* FAC ¶¶ 60–61, 95–97.

Danielides offers two separate motivations for Northrop to exert less than its best efforts. First, doing so led to greater profits on the Counter-MANPADS project itself. FAC ¶ 55. Second, doing so led to greater profits on Northrop's military contracts: The Counter-MANPADS system was derived from, and shared components with, the military anti-missile system. FAC ¶¶ 3, 57. Danielides alleges that Northrop decided not to improve those common components. FAC ¶ 56. That

decision undermined the Counter-MANPADS project, but allowed Northrop to make money repairing and replacing those faulty components on military aircraft. FAC ¶¶ 56–57.

### 2. Northrop Did Not Exert its Best Efforts, but Represented that it Had Done So.

Danielides alleges that Northrop did not exert its best efforts on the Counter-MANPADS project. Specifically, he alleges that the government agreed to pay Northrop for its budgeted costs, plus a 12% profit, but Northrop made a nearly 25% profit by not doing work that it was paid to do (and not spending the money that was budgeted for that work). FAC ¶¶ 10, 54. For example, Northrop was required to use an engineering method named FRACAS (Failure Reporting and Corrective Action System). FAC ¶¶ 11, 35. But Northrop spent only 21% of funds budgeted for FRACAS, keeping the rest as profit. FAC ¶¶ 13, 82. As another example, Northrop spent only 13% of the funds budgeted for a "Sustaining Test and Evaluation" for the system, keeping the rest as profit. FAC ¶ 84. As a third example, Northrop budgeted $115,628 to develop a manufacturing and support plan, but spent only $1,203 and kept the rest. FAC ¶ 85.

Danielides alleges that throughout phase three, Northrop repeatedly told the government that it was exerting its best efforts to improve system reliability, when in fact no work was being done at all. FAC ¶¶ 14, 49, 83. Danielides alleges that Northrop falsely represented that it was "using all available program resources" and that its efforts were limited only by "schedule and budget restraints." FAC ¶¶ 43, 103. Danielides discusses three incidents in detail:

<u>a. October 2007 Design Review Meeting</u>

Danielides alleges that "at a critical design review attended by Homeland Security, the U.S. Air Force, and Northrop personnel on October 4, 2007, Northrop represented that it had performed corrective action as part of the FRACAS methodology, when in fact no such work had been done." FAC ¶ 12. As of that date, Northrop had budgeted $841,346 for FRACAS corrective action, but had spent nothing, as it had done no such work. FAC ¶ 12. Danielides alleges that at this meeting, Northrop also represented that its "Reliability Improvement Program" followed the "FRACAS Methodology applied to the total system." FAC ¶ 79. Danielides says that representation was false, because no reliability work had been done on a critical component, much less the "total system." FAC ¶ 79. Additionally, Northrop presented a slide that showed that FRACAS data review began on April 1, 2007, and FRACAS corrective action began on September 3, 2007—but in reality, no such data review or corrective action had begun. FAC ¶¶ 80–81.

At the October 4, 2007 meeting, Northrop showed DHS a chart, which represented that Northrop had spent $25.7 million by January 1, 2007. FAC ¶ 108. But Northrop's actual expenditures were nearly $3 million less. FAC ¶ 108. The same chart showed Northrop having spent $45.55 million by August 1, 2007, but its actual expenditures were nearly $3.5 million less. FAC ¶¶ 16, 107. Sometime later, Northrop's finance manager created an accurate chart, but Northrop did not want to show it to DHS because it revealed that Northrop had money left over. FAC ¶¶ 110–112. Northrop never shared the accurate chart and never corrected the inaccurate representation made at the October 4, 2007 meeting. FAC ¶ 112.

The October 4, 2007 meeting was a contractual requirement, tied to a $3.3 million milestone payment. FAC ¶ 76. Northrop submitted a claim for that payment on October 29, 2007, and it was paid in full. FAC ¶ 86.

<u>b.</u>  <u>November 2007 Interim Report</u>

On November 28, 2007, Northrop presented an "Interim Reliability Improvement Program Report." FAC ¶¶ 87–88. Danielides alleges that the interim report represented that Northrop had complied with the contract by implementing corrective actions "per . . . scheduling and budgeting constraints." FAC ¶ 89 (ellipsis in original). Danielides says that was a false representation because Northrop "had not spent what it said it would or even an appreciable fraction of what was permitted by schedule and budgeting constraints." FAC ¶ 89 (internal quotation marks omitted). The interim report also represented that Northrop was following the FRACAS methodology, when in fact "no meaningful FRACAS work had been done." FAC ¶ 90. The interim report was a contractual requirement tied to a $500,000 payment. FAC ¶ 87. Northrop submitted a claim for that payment on November 30, 2007, and it was paid in full. FAC ¶ 91.

<u>c.</u>  <u>March 2008 Final Milestone Report</u>

In its final report, Northrop falsely stated that it had performed FRACAS tasks according to the contract. FAC ¶ 92. The final report also stated: "Identification of failures [was] performed by collecting and analyzing existing legacy field data, life test data, IRCM product line FRACAS, Guardian System FRACAS, and failure data from other DIRCM programs." FAC ¶ 92. Danielides says this representation was false because "Northrop had expended little or no efforts or

9

funding to complete these tasks." FAC ¶ 92. The final report was a contractual requirement, tied to a $1.3 million milestone payment. After the final report, Northrop submitted a claim for that payment, which was paid in full. FAC ¶ 94.

### d. PASE Program

Northrop proposed an add-on to the Counter-MANPADS project, called PASE (Passenger Aircraft Service Evaluation). FAC ¶ 114. DHS rejected the proposal, but Northrop had already spent $2.17 million on "bid and proposal work and other various tasks for the PASE program." FAC ¶ 114. Allegedly, Northrop improperly accounted for these costs as if they had been incurred on the Counter-MANPADS project itself. FAC ¶ 114. Denton rationalized the decision to include PASE costs in the Counter-MANPADS accounting by insisting that DHS had "played" Northrop (presumably during the proposal and bidding for PASE). FAC ¶ 116. Danielides complained about the improper accounting, but was mocked for doing so. FAC ¶ 116. On one occasion, Denton, aware that Danielides was socializing with DHS employees, sent Danielides an email saying "NO NGC DISCUSSION OF PASE— NONE." FAC ¶ 117.[3]

### D. Alleged False Claims Concerning the Subsequent "Mod 8" Contract

In mid-2007, Northrop and DHS entered into a new contract (called Mod 8), which added $3 million to the phase three deal. FAC ¶¶ 64–65. Danielides alleges that Northrop induced the government to enter into Mod 8 through false

---

[3] The amended complaint does not explain what "NGC" means. I suspect it means "Northrop Grumman Corporation," but the meaning is not important to this opinion.

representations. Specifically, Danielides alleges that Northrop falsely represented that (1) it lacked adequate funds to complete the phase three work; (2) it had "teamed up" with Northwest Airlines; and (3) it would spend $650,000 of its own money on the Mod 8 work. FAC ¶¶ 65–67. Further, Northrop never intended to perform some of the work that Mod 8 contemplated. FAC ¶ 69.

## III. Analysis

### A. Representations Concerning Northrop's "Best Efforts"

To be actionable under the False Claims Act, a false statement or omission must be tied to a claim for payment. While Danielides discusses a few instances of specific milestone payment claims (*see* [61] at 12 & n.9), the parties agree that Danielides advances theories of fraudulent inducement and material omission that encompass *all* of the phase three claims for payment. *See* [49] at 3–4; [61] at 12 & n.9. Specifically, Danielides alleges that during the phase three contract's negotiation, Northrop promised to exert its "best efforts," but never actually intended to do so, thereby fraudulently inducing the government to enter the agreement. *E.g.*, FAC ¶ 129(a). Danielides also alleges that every time Northrop asked for a milestone payment, it omitted material information—namely, that it had not exerted its "best efforts" on the project and it was not performing its obligations. *E.g.*, FAC ¶ 129.[4] In support of its motion to dismiss, Northrop makes

---

[4] Explicit false certifications can be false claims under the FCA. *E.g.*, *Yannacopoulos*, 652 F.3d at 824 ("If the breaching party falsely claims to be in compliance with the contract to obtain payment, however, there may an actionable false claim"). Some courts have held that *implied* certifications may also give rise to FCA liability, though the Seventh Circuit has not yet decided that issue. *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 2014 U.S. App. LEXIS 16063, *26–27 n.13 (7th Cir. 2014). I need not

two arguments: First, Northrop argues that because "best efforts" is an imprecise term, the representations at issue were not *objectively false*, as required under the FCA. Second, Northrop argues that whether or not it exerted its best efforts, the government was contractually required to make the milestone payments, so the representations at issue were not *material*, as required under the FCA.

### 1. Objective Falsehood

An FCA violation cannot stand on "mere differences in interpretation growing out of a disputed legal question involving the terms of a contract." *Yannacopoulos*, 652 F.3d at 836 (internal citation omitted); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *accord United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008). Rather, liability must be based on an "objective falsehood." *Yannacopoulos*, 652 F.3d at 836. Thus, if Danielides had merely alleged that Northrop failed to exert its "best efforts," under the meaning of that term that Danielides urges is correct, he would not have stated a claim under the FCA. (Such an allegation states a breach-of-contract claim that only the government could bring.)

But Danielides has done more: he has alleged that both Northrop and the government agreed on a specific definition, under which Northrop was considered to have exerted its "best efforts" on a particular task either by completing that task, or

---

decide whether implied certifications trigger liability because Danielides says that he is not pursuing an implied certification theory ([61] at 12 & n.10), and he is bound by that concession. Danielides's theory is that Northrop's claims for payment contained material omissions. Material omissions can support an FCA claim. *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

by spending all of the money that it had budgeted for that task in a legitimate attempt to complete it. *See* FAC ¶¶ 6, 7, 12–13, 38–39, 42, 53, 81–82, 84–85. Accepting that factual allegation as true, as I must at this stage, there is no reason that Northrop's representations concerning its efforts cannot be deemed either true or false, objectively. Danielides's allegations of a specific, shared definition distinguish this case from *Wilson*, a case heavily relied on by Northrop. *Cf. Wilson*, 525 F.3d at 377 ("Relators do not claim that the maintenance provisions in the contract set forth anything resembling a specific maintenance program for the convoy trucks. Likewise, they make no contention that representations were made concerning specific acts of maintenance that [defendant] knew it lacked the capacity to perform.").

Danielides has therefore alleged more than a breach-of-contract claim because he has alleged that "best efforts" had a fixed meaning to the parties and was an inherent representation being made to the government in the claims for payment—a fact that I accept at this stage. It may be that with some limited discovery, this question becomes a purely legal one, not subject to a factual dispute, but at this stage, I find that Danielides has plausibly alleged that Northrop lied to the government when seeking payment.[5] He will eventually have to prove more than simply that "best efforts" means what he urges—he'll have to prove that Northrop *knew* that, so that if Northrop made representations inconsistent with

---

[5] I note that several of the key cases cited by Northrop were decided at summary judgment. *E.g.*, *Yannacopoulos*, 652 F.3d 818; *Lamers*, 168 F.3d 1013; *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir. 1999); *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008).

that meaning, they were objectively false. Danielides must also prove that this meaning of "best efforts" was also the government's understanding in the context of this specific contract, such that one could find that there is a meaningfully false statement or material omission in the parties' course of dealing.

### 2. Materiality

To state a claim under the FCA, a plaintiff must allege that the defendant's false statement was material to the government's decision to make a payment. *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 858 (7th Cir. 2006); *Gross*, 415 F.3d at 604; *Lamers*, 168 F.3d at 1019; *Absher*, 2014 U.S. App. LEXIS 16063 at *36. Northrop argues that the representations at issue were not material because—under what Northrop urges is the proper reading of the contract—the government was required to make its milestone payments, whether or not Northrop was exerting its best efforts. [49] at 10–14. Even if Northrop's interpretation of the milestone payment provisions is correct, the government had the authority to unilaterally terminate the contract at any time. [49-1] art. II, § B. I cannot say as a matter of law at this stage that the government would not have exercised that authority, had it been told by Northrop that Northrop was not performing its obligations.

Further, Danielides has alleged that Northrop lied right from the start about its intent to exert its best efforts, and its lies induced the government to enter the phase three contract. If that's true, those false statements were "integral to a causal chain leading to payment," and such false statements state a claim under the FCA. *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005);

14

*see also United States ex rel. Simpson v. Bayer Healthcare*, 732 F.3d 869, 876 (8th Cir. 2013) ("when a relator alleges liability under a theory of fraud-in-the inducement, claims for payment subsequently submitted under a contract initially induced by fraud do not have to be false or fraudulent in and of themselves . . . .").[6]

Danielides's allegations concerning Northrop's "best efforts" therefore clear the two hurdles—objective falsehood and materiality. Northrop's motion is denied as to these allegations.

## B. Representations Concerning "Mod 8"

Danielides briefly alleges that Northrop fraudulently induced DHS to enter into a new contract, called Mod 8, which added $3 million in funding to the Counter-MANPADS project. FAC ¶¶ 64–69. Specifically, Danielides alleges that Northrop falsely represented that (1) it lacked adequate funds to complete the phase three work; (2) it had "teamed up" with Northwest Airlines; and (3) it would spend $650,000 of its own money on the Mod 8 work. FAC ¶¶ 65–67. But Danielides has failed to plead the "who, what, when, where, and how" of the alleged fraud. *See Beyrer*, 722 F.3d at 948. It is not clear, for example, who made such representations, what about them is objectively false, or how they would have induced DHS to enter

---

[6] Danielides pleads the requisite scienter and intent with sufficient particularity. *See, e.g.*, FAC ¶ 1 ("Northrop knowingly engaged in schemes to pursue higher profits at the expense of protecting civilian airliners from terrorist threats."); ¶ 8 ("Northrop repeatedly promised the United States that it would do work that it never intended to do, falsely represented that work was being done, and covered up its misrepresentations through deceptive reports."); ¶ 55 ("Northrop intended to realize a vastly greater profit than it negotiated: rather than doing the tasks used for pricing the contract, Northrop instead intended to and did provide only minimal, token or sham efforts, including no work at all where that could be concealed from the government."); ¶ 129(a) ("Despite promising to do so, Northrop never intended to provide its best efforts in performing the contract and fraudulently induced the government to enter into the Phase III contract modifications and options").

into Mod 8. As an example, it is not clear whether Danielides alleges that Northrop failed entirely to contribute its promised $650,000, or whether it chose to do so in "credits" from "other programs" instead of cash. FAC ¶ 69. The answer is important, given the requirements of objective falsehood and materiality. The allegations concerning fraudulent inducement to enter Mod 8 fail to meet the heightened pleading standard of Rule 9(b).

## IV.    Conclusion

Danielides has adequately and plausibly alleged that Northrop induced the government to enter into phase three through false statements, and made claims for payment (via Payable Milestones Reports) that omitted material information. I share Northrop's concern that the complaint could be a breach-of-contract case improperly shoehorned into a False Claims Act case, but ultimately find that Danielides pleads a cognizable theory. For the foregoing reasons, Northrop's motion to dismiss [48] is denied, except with respect to the allegations of fraudulent inducement to enter Mod 8, which are dismissed.

ENTER:

Manish S. Shah
United States District Judge

Date:  10/23/14