| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. LEO DANIELIDES, and LEO DANIELIDES, individually,<br><br>      Plaintiffs,<br><br>      v.<br><br>NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>      Defendant. | No. 09 CV 7306<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

The United States entered into a contract with Northrop Grumman Systems Corporation to work on a project to protect civilian aircraft from missile attacks. The agreement was styled as a "fixed price best efforts" contract, and Leo Danielides, a former Northrop Grumman employee, alleges that Northrop Grumman lied when it accepted and endorsed the term "fixed price best efforts" in entering into the contract and in its requests for payment from the government. According to Danielides, Northrop Grumman never intended to use, and never used, its "best efforts" to perform on the contract, and "fixed price best efforts" had a specific, objective meaning mutually understood by both the government and Northrop Grumman. On behalf of the United States, Danielides sued Northrop Grumman under the False Claims Act, alleging that Northrop Grumman's lies and omissions about best efforts amounted to false claims for payment. Defendant

moves for summary judgment and to exclude Danielides's expert. For the reasons discussed below, both motions are granted.

## I.    Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made," the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); see also *Celotex*, 477 U.S. at 322. A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In its analysis, the court must construe the facts and make reasonable inferences in the light most favorable to the nonmoving party. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).

## II.    Background

In 2003, Congress directed the Department of Homeland Security to develop a system for defending commercial aircraft against shoulder-launched missiles known as man-portable air-defense systems (MANPADS). [114] ¶ 3.[1] In response, DHS carried out a missile-defense project called the Counter-MANPADS or C-

---

[1] The bracketed numbers refer to docket numbers on the district court docket. [114] refers to defendant's statement of material facts with Danielides's responses and [120] refers to Danielides's statement of additional material facts with defendant's responses.

MANPADS program, which was implemented in three phases. [114] ¶ 4. Work was awarded to contractors, including Northrop Grumman, through Other Transaction Agreements, which are exempt from most regulations applicable to government procurement contracts. [114] ¶¶ 6–12. The agreement for Phase I of the C-MANPADS project was the first Other Transaction Agreement negotiated by the Rolling Meadows, Illinois, campus of Northrop Grumman's Electronic Systems Sector. [114] ¶ 14. Subsequent agreements for Phases II and III were executed through modifications to the Phase I agreement. The Phase II agreement was executed in October 2004 as Modification P00002. [114] ¶ 9. The Phase III agreement was executed primarily through two modifications: Modification P00007 executed in August 2006, and Modification P00008, executed in May 2007. [114] ¶ 11. The period of performance for Phase III was June 9, 2006, through March 31, 2008. [114] ¶ 15.

The Phase II and III agreements were "fixed price best efforts" agreements. During negotiations for Phase II, DHS's contracting consultant requested that Northrop Grumman add the description "fixed price best efforts" into the Phase II agreement. [114] ¶ 63; [120] ¶ 11. The Phase II agreement stated: "The Agreement can be best described as a fixed price best efforts agreement with payments based on the completion criteria outlined in Article IV [Payable Event Schedule and Deliverables]." [99-3] at Art. VI ¶ 1. Later during Phase III negotiations, the term "fixed price best efforts" dropped out of a government draft, but was reinstated after Northrop Grumman's contract administrator had a phone call with a DHS

contracting officer to discuss Northrop Grumman's "unquantifiable risk" without this term. [120] ¶ 33. The Phase III agreement stated: "The Agreement is a fixed price best efforts agreement with payments based on milestone payments which will be made only upon the completion of the acceptance criteria outlined in Attachment 3 as accepted by the Government." [99-7] at Art. VI ¶ A.1. Neither the Phase II agreement nor the Phase III agreement defines "fixed price best efforts" or "best efforts." [114] ¶ 64.

The C-MANPADS Phase II and III agreements were the first "fixed price best efforts" Other Transaction Agreements ever used by Northrop Grumman's C-MANPADS team (including Danielides) and were the first "fixed price best efforts" agreements used by DHS's contracting consultant and Phase III contracting officer. [114] ¶ 66; [120-1] ¶ 6; [120-2] ¶¶ 4, 7. Northrop Grumman never sought clarification with DHS about the meaning of "fixed price best efforts," but understood that the term "fixed price best efforts" limited the financial risk of both Northrop Grumman and DHS. [120] ¶ 15; [114] ¶ 67. In a traditional fixed price contract, the contractor is obligated to complete the deliverables no matter what the cost. [114] ¶ 71. In the Phase III agreement, if Northrop Grumman could not complete the deliverables for the fixed price, it could declare "best efforts" and renegotiate the scope of the work. [114] ¶ 74.

The general structure of the Phase III agreement, as relevant to this dispute, was as follows:

Milestone Payments: The obligation and payment section provided that Phase III payments were "based on milestone payments which will be made only upon the completion of the acceptance criteria" attached to the agreement. [99-7] at Art. VI ¶ A.1. The payable event and deliverables section provided that "Northrop Grumman shall be paid for each Payable Milestone accomplished and delivered in accordance with the Schedule of Payments, Accomplishment Criteria and Payable Milestones set forth in Attachment 3, Payable Milestones." [99-7] at Art. IV ¶ A. The scope section also stated that Northrop Grumman would be paid for each payable milestone that was accomplished and delivered. [99-7] at Art. I. The payable milestones and their corresponding acceptable criteria and payment amounts were listed in the Schedule of Phase III Payments and Payable Milestones attached to the agreement. [99-11]; [114] ¶¶ 11, 24.

Statement of Work, Task Description Document, and Deliverables: Both the Statement of Work (SOW) and Task Description Document (TDD) were attached to the agreement. [114] ¶ 11. The Statement of Work provided a high-level summary of the scope of work to be performed in different C-MANPADS program categories and listed specific deliverables corresponding to these categories of work. [99-9]. The entire list of deliverables was also included in the Phase III agreement itself. [99-7] at Art. XIV; [114] ¶ 16. The Task Description Document charted the specific tasks required to accomplish the work and deliverables described in the Statement of Work. The payable event and deliverables section provided: "Northrop Grumman shall perform the work as specified in the SOW (Attachment 1) and as outlined in

the TDD (Attachment 2)." [99-7] at Art. IV ¶ A. Similarly, the scope section stated that Northrop Grumman shall perform the work required by the Statement of Work and Task Description Document. [99-7] at Art. I.

Top-Level Performance Objectives: The scope section provided: "During Phase III of the program, Northrop Grumman shall perform the operational test and evaluation and shall continue engineering activities that focus on continuing to advance the system's design to address the Phase III Top-level Performance Objectives as contained in Attachment 10." [99-7] at Art. I. The attached Top-Level Performance Objectives reflected DHS's long-term vision of what was needed to deploy the missile defense system on a commercial airline fleet. [114] ¶ 32. All three phases of the C-MANPADS project included a broad set of Top-Level Performance Objectives, and some of the same Top-Level Performance Objectives were included in each of the three phases. [114] ¶ 30.

At the end of Phase III, Northrop Grumman reported to DHS on the progress made toward each Top-Level Performance Objective, including listing each objective that had not been satisfied and recommending further system improvements. [114] ¶ 34. Before making the final two milestone payments, DHS formally requested that Northrop Grumman provide additional financial data. [114] ¶¶ 55–57. Northrop Grumman responded that it was entitled to payment for completing the milestone criteria attached to the Phase III agreement, without providing additional financial data. [114] ¶¶ 58–60. After receiving Northrop Grumman's response, DHS paid Northrop Grumman for meeting the final two milestones. [114]

¶¶ 27, 61. DHS never invoked the Phase III agreement's dispute resolution procedure in connection with its request for additional financial data. [114] ¶ 62.

Northrop Grumman moved to dismiss Danielides's FCA complaint, arguing that he failed to allege an objective falsehood because "best efforts" was an imprecise contractual term. The motion was denied because Danielides alleged that "best efforts" had a fixed meaning to the parties and was an inherent representation being made to the government in Northrop Grumman's claims for payment. On the pleadings, that was enough to survive a motion to dismiss. But in denying the motion, I noted that Danielides would have to come forward with some evidence to suggest that his interpretation of the contract was correct and shared by both Northrop Grumman and DHS, such that one could find that there was a meaningfully false statement or material omission in the parties' course of dealing. [73] at 13–14.

Discovery proceeded in stages, with the parties focused first on developing evidence concerning "fixed price best efforts" and whether it amounted to an objectively false representation. Defendant now moves for summary judgment on that issue alone. In response to defendant's motion, Danielides offers expert testimony, and defendant in turn moves to exclude the expert.

## III. Analysis

### A. Motion to Exclude Expert Opinions

Danielides offers Ronald Flom as an expert in government procurement. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702, "the district court is tasked with determining whether a given expert

is qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010) (citing *Daubert,* 509 U.S. at 592–93). Before admitting expert testimony under *Daubert* and Rule 702, a court must determine: 1) whether the witness is qualified; 2) whether the expert's methodology is scientifically reliable; and 3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Illinois Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Danielides bears the burden of demonstrating by a preponderance of the evidence that Flom's testimony would satisfy the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 104(a) and Fed. R. Evid. 702, Advisory Comm. Note (2000 Am.)).

Flom is a retired U.S. Army Colonel, with twenty-nine years of experience in procurement or acquisition-related duties. Flom has twelve years of experience in performing contract administration services, including multiple assignments in the Department of Defense's Defense Contract Management Agency and senior positions in that agency and in the Defense Contract Management Command. Flom has monitored and provided oversight of Other Transaction Agreements as well as contracts under the Federal Acquisition Regulation. [102-1] (Flom Report) at 1–3.

In his report, Flom offers the following opinions that fall into three general categories ([102-1] at 5–13):

1) The industry meaning of "fixed price best efforts":

- A "fixed price best efforts" contract has an industry meaning, requiring the expenditure of a specific number of labor hours or budgeted funding during a stated period of time, for a fixed price, or alternatively, the completion of all contracted tasks and objectives;

2) The tasks Northrop Grumman agreed to perform under the C-MANPADS contract:

- Northrop Grumman agreed to complete all of the tasks and objectives identified in the contract or expend all budgeted funds;

- The C-MANPADS contract required financial and cost data reporting;

3) The understanding and knowledge held by Northrop Grumman, DHS, and a hypothetical DHS contracting officer:

- Northrop Grumman understood the C-MANPADS contractual requirements and made misrepresentations to DHS by deliberately withholding financial data;

- DHS understood the meaning of "fixed price best efforts" as used in the C-MANPADS contract;

- A reasonable government contracting officer would have understood what was required under the C-MANPADS contract and would not have paid Northrop Grumman had it known of Northrop Grumman's misrepresentations.

Flom's opinions are addressed in turn below.

## 1. Industry Meaning of "Fixed Price Best Efforts"

Northrop Grumman argues that Flom is not qualified to opine on the meaning of "fixed price best efforts" because he has never negotiated an Other Transaction Agreement and that Flom's opinion is unreliable because he fails to

link his government contract experience to any industry guidelines or particular experience with Other Transaction Agreements using the term "fixed price best efforts." Danielides argues that Flom's years of experience in supervising administration of Other Transaction Agreements qualifies him to opine on the industry meaning of the term "fixed price best efforts" and that Flom need not have negotiated a "fixed price best efforts" Other Transaction Agreement in order to have expertise on the industry meaning of the term.

"Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting in part Fed. R. Evid. 702). Indeed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Comm. Note (2000 Am.). "Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp.*, 619 F.3d at 761 (quoting in part *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). As an expert "relying solely or primarily on experience" for his opinion, Flom must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Comm. Note (2000 Am.).

To offer his expert opinion on a "fixed price best efforts" Other Transaction Agreement, Flom must show how his experience gave him specialized knowledge of industry use of the term "fixed price best efforts" in an Other Transaction

Agreement. Flom has not done so. When asked to identify his experience with Other Transaction Agreements using the specific term "fixed price best efforts," Flom identified one Other Transaction Agreement that may have used the term "best efforts" but admitted that he could not recall whether that agreement actually used the phrase "fixed price best efforts" instead of some combination of "fixed price" and "best efforts"—not necessarily consecutively. [102-2] (Flom Dep.) at 77–82. He also pointed to his supervision of a Defense Contract Management center in Syracuse, New York, that administered Other Transaction Agreements. [102-2] at 43–48. Based on his interactions with the center, Flom believed that the center administered a number of "fixed price best efforts" Other Transaction Agreements. [102-2] at 95–98. But Flom did not actually review any of those Other Transaction Agreements and did not personally know whether any of those Other Transaction Agreements used the phrase "fixed price best efforts." [102-2] at 97–99.

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, Advisory Comm. Note (2000 Am.); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419–20 (7th Cir. 2005) (An expert "may be the world's leading student" on a particular topic, "but if he could or would not explain how his conclusions met the Rule's requirements, he was not entitled to give expert testimony."). Despite his years of experience with Other Transaction Agreements in general, Flom has not established any experience with the term "fixed price best efforts" in an Other Transaction Agreement to allow him to reliably opine on its purported industry meaning. *See, e.g., Clark v. Takata Corp.*,

192 F.3d 750, 759 n. 5 (7th Cir. 1999) (Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions . . . are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."). His opinion on the industry meaning of "fixed price best efforts" is inadmissible.[2]

## 2. C-MANPADS Contractual Requirements

Danielides submits that Flom's opinions about the overall requirements of the C-MANPADS contract are the product of his experience, and therefore admissible. Experts can offer interpretations of contract language based on industry usage, *see WH Smith Hotel Services, Inc. v. Wendy's International, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994), but "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Flom's opinion, based on reading the contract with his experience in mind, strays from the helpful explanation of unfamiliar jargon and enters the field of impermissible legal conclusion. An expert witness may not testify simply regarding his reading of a contract, and that is what Flom has done here. *See RLJCS Enters., Inc. v. Prof'l*

---

[2] Flom also offers an opinion that in the industry, the term "best efforts" is interchangeable with the term "level of effort," but does not cite to any authority or describe how he formulated this opinion based on his experience. Instead, Flom admitted that these are "two different terms referring to two different types of contractual documents" but that he has "seen them used interchangeably," without explaining when or why those terms are sometimes different and sometimes interchangeable. [102-2] at 99–100. *See, e.g.*, *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting testimony where expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so'"). This opinion is inadmissible.

*Ben. Trust Multiple Emp'r Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969).

Flom's opinions on the C-MANPADS contract requirements are inadmissible.[3]

### 3. Northrop Grumman's, DHS's, and a Reasonable Government Contracting Officer's Knowledge

An expert witness may testify as to "scientific, technical, or other specialized knowledge" outside the experience or understanding of a layperson where such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 601–03 (7th Cir. 2011). However, "[a] court is expected to reject 'any subjective belief or speculation.'" *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quoting in part *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). Flom is not a fact witness and lacks direct knowledge of Northrop Grumman's or DHS's state of mind. He came to his opinion about the contracting parties' mental states by evaluating various documents in the record, making inferences, and assessing the experience and credibility of witnesses (such as DHS's contracting consultant). [102-1] at 8–12. Flom has provided no basis for why he can better ascertain the state of Northrop Grumman's or DHS's knowledge, as compared to any prospective juror interpreting their words and actions. Flom speculates as to Northrop Grumman's and DHS's knowledge, offering no more than

---

[3] As are Flom's opinions on the state of mind of a hypothetical DHS contracting officer, which are based on his overall interpretation of the contract.

the drawing of an inference from the record in the case. Permitting these expert opinions would be merely substituting Flom's judgment for a jury's. *See, e.g., DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (error to permit expert, who was not a fact witness, to testify that defendant had a particular motive); *compare Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461–62 (7th Cir. 2014) (expert permitted to testify on general state of knowledge prevalent in an industry, but not defendant's knowledge or state of mind). Therefore, Flom's opinions on these topics are inadmissible.

Defendant's motion to exclude Flom's testimony is granted.

## B. Motion for Summary Judgment

### 1. The False Claims Act

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented" to the United States or its representatives "a false or fraudulent claim for payment or approval," or "who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).[4]

---

[4] Danielides pleaded this action under §§ 3729(a)(1)–(2) of the pre-2009 version of the False Claims Act. [28] ¶ 124. Amendments in 2009 changed § 3729(a)(1) to § 3729(a)(1)(A), which applies to conduct on or after May 20, 2009. Pub. L. 111-21, § 4(f). The amendments also changed § 3729(a)(2) to § 3729(a)(1)(B), which applies to cases pending on or after June 7, 2008. *Id.* § 4(f)(1); *see United States v. Sanford-Brown, Ltd.,* 788 F.3d 696, 701 n.1 (7th Cir. 2015); *United States ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818, 822 n. 2 (7th Cir. 2011). The allegations in this case range from 2006 to approximately March 2008, and the case was brought in November 2009. So the former § 3729(a)(1) and the current § 3729(a)(1)(B) apply to Danielides's claim. These amendments, including the addition of materiality to § 3729(a)(1)(B), do not change the applicable analysis. Prior to the amendments, the Seventh Circuit already required materiality in the context of a claim alleged to be false due to omissions, as is claimed here. *See Luckey v. Baxter Healthcare*

To succeed on an FCA claim, "a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *United States ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818, 822 (7th Cir. 2011). Danielides's FCA claim alleges that Northrop Grumman fraudulently induced the government to enter the Phase III agreement because it promised during negotiations to exert its "best efforts" but never actually intended to do so, and that every time Northrop Grumman asked for a milestone payment, it omitted material information—namely, that it had not exerted its "best efforts" on the project and was not performing its obligations. [28] ¶ 129. An FCA violation cannot stand on "mere differences in interpretation growing out of a disputed legal question involving the terms of a contract" but instead must be based on an "objective falsehood." *Yannacopoulos*, 652 F.3d at 836 (internal citation omitted). In opposing Northrop Grumman's motion for summary judgment, Danielides acknowledges that to establish an objective falsehood by Northrop Grumman, he must "show the existence of triable issues of fact regarding whether his interpretation is the correct meaning of the contract and that both DHS and Northrop Grumman shared in that knowledge." [113] at 10.

---

*Corp.,* 183 F.3d 730, 732–33 (7th Cir. 1999); *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

## 2. Objective Falsehood

### a. Phase III Profit

Danielides interpreted the Phase III "fixed price best efforts" agreement to mean that Northrop Grumman must have either completed all of the Phase III contract tasks and objectives or, alternatively, must have spent all of Northrop Grumman's budgeted funds—up to a guaranteed profit of 12%—in a legitimate effort to do so. [113] at 2–4, 10–17; [99-19] (Danielides Dep.) at 150–52; [28] ¶¶ 5, 10, 38–40, 53–55. In his sur-reply, however, Danielides concedes that neither the Northrop Grumman nor DHS witnesses understood the Phase III agreement to require Northrop Grumman to expend its budgeted funds up to a guaranteed profit of 12% if it did not meet the contractual objectives.[5] [124] at 1–2. This significantly alters Danielides's interpretation and understanding of the Phase III agreement, its financial underpinnings, and Danielides's allegations that Northrop Grumman unilaterally increased its profit margin more than its guaranteed profit of 12%. *See, e.g.*, [28] ¶¶ 5, 10, 38–40, 53–55; [99-19] at 150–52; [113] at 4, 8; [114] ¶ 76. More importantly, this concession means that Danielides cannot show that his interpretation of the contract (requiring completion of all Phase III contract tasks and objectives or an expenditure of funds up to a 12% profit) was either correct or shared by both DHS and Northrop Grumman. If neither DHS nor Northrop Grumman understood that "best efforts" meant what Danielides says it meant, then

---

[5] Northrop Grumman and DHS witnesses agreed that, under the C-MANPADS "fixed price best efforts" agreements, Northrop Grumman was not guaranteed a 12% profit, or even any profit. [99-14] at 38–39, 61–62; [99-16] at 130–31, 135–37, 149–50; [120-1] ¶ 10.

Northrop Grumman's representation was not the objective falsehood he claims it was. And, therefore, he cannot prove that a representation of "best efforts" was a false claim in violation of the FCA.

<u>b.</u> <u>Phase III Requirements</u>

The 12% profit aside, Danielides argues that he can still show that "fixed price best efforts" was an objective falsehood because DHS and Northrop Grumman both understood that the term required Northrop Grumman to complete *all* of the Phase III contractual objectives or spend *all* of the contract funds, and that Northrop Grumman did neither. [124] at 2. Danielides has not marshaled evidence that would allow a trier of fact to find this revised interpretation was shared by Northrop Grumman and DHS.

Northrop Grumman agrees that it was required to complete certain obligations under the Phase III agreement or spend the funds provided by the government in an attempt to do so. The key point of disagreement between Northrop Grumman and Danielides is the extent of Northrop Grumman's obligations under the Phase III agreement. Northrop Grumman argues that its Phase III obligations were limited to completing the milestones plus the tasks and deliverables described in the Statement of Work and Task Description Document (attached to the Phase III agreement). Danielides argues that, in addition to those obligations, Northrop Grumman was required to complete the Top-Level Performance Objectives and additional tasks in the Technical Performance Metrics and in the Phase III Final Report. [113] at 5–8, 14–17; [124] at 4–6; [99-47] at 6–7.

In support, Danielides cites to Northrop Grumman documents referencing the "fixed price best efforts" agreement and recommending use of "all available program resources" or reallocation of resources for accomplishing tasks described in the Task Description Document and Statement of Work. [113] at 6–7. At best, however, these documents are clarifications regarding activities in the Task Description Document and Statement of Work (and entirely consistent with Northrop Grumman's position); they do not shed light on whether Northrop Grumman believed it was required to achieve tasks outside the Task Description Document or Statement or Work. Danielides also points out that DHS's Phase III Solicitation indicated that some of the Phase III deliverables were merely updates to reports that had been deliverables in Phase II, and he argues that therefore it would be unreasonable for DHS to pay Northrop Grumman millions of dollars for merely updating old reports. But even if some of the Phase III deliverables were updates to Phase II deliverables, that does not show that Northrop Grumman understood that additional objectives or tasks were required under the contract.[6]

To infer Northrop Grumman's belief that there were more objectives requiring its "best efforts," Danielides cites to the declarations of DHS's contracting consultant, John Ablard, and DHS's Phase III contracting officer, Mark Robbins. Robbins's declaration identifies at least one Top-Level Performance Objective that

---

[6] Northrop Grumman argues that Danielides improperly relied on extra-contractual documents, including DHS's Phase III Solicitation, to support his interpretation of "fixed price best efforts." But Danielides alleges fraud, so extra-contractual documents may be considered even though the Phase III agreement contains a merger clause. *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002).

he believed Northrop Grumman was obligated to achieve or spend all funds under the contract in an effort to achieve the objective. [115-6] ¶ 7. Ablard's declaration refers to Northrop Grumman's obligation to achieve C-MANPADS Program objectives generally, and this could reasonably be inferred to include Top-Level Performance Objectives. [115-5] ¶ 4. Both Ablard and Robbins stated that they recalled no discussion with Northrop Grumman showing that it was operating under a different understanding of "fixed price best efforts." [115-5] ¶ 5; [115-6] ¶ 5. Based on this, Danielides infers that Northrop Grumman shared Ablard's and Robbins's same understanding of the Phase III agreement. However, in supplemental declarations, Ablard and Robbins clarified that they did not recall *any* discussions with Northrop Grumman employees regarding the meaning of "fixed price best efforts." [120-1] ¶ 7; [120-2] ¶ 10. Northrop Grumman's knowledge (and the representations it intended to make within "best efforts"), therefore, cannot be inferred from these DHS witnesses.

Danielides also infers Northrop Grumman's shared understanding of the Phase III agreement from Northrop Grumman's experience and long involvement in the government contracting industry. However, the C-MANPADS Phase II agreement was the first Other Transaction Agreement negotiated by the Rolling Meadows, Illinois, campus of Northrop Grumman's Electronic Systems Sector, [114] ¶ 14, and was the first "fixed price best efforts" Other Transaction Agreement used by the members of the Northrop Grumman C-MANPADS team, including Danielides. [114] ¶ 66. Similarly, both DHS's consultant Ablard and its contracting

officer Robbins also stated that the C-MANPADS agreements were their first experience with a "fixed price best efforts" agreement. [120-1] ¶ 6; [120-2] ¶¶ 4, 7. Given this lack of experience with "fixed price best efforts" agreements on the part of both DHS and Northrop Grumman, Danielides cannot establish an inference of a shared understanding of the Phase III agreement based on Northrop Grumman's experience in the government contracting industry.

In addition, Danielides argues that limiting "best efforts" to only certain tasks and objectives is such an unreasonable interpretation of the contract that Northrop Grumman must have truly believed the contrary—that *all* objectives were required by "best efforts." But this argument reveals that the debate here is a dispute over the meaning of a term in a contract, not an issue of fraud.

There are multiple references in the contract to payment upon completion of those milestones and deliverables described in the Statement of Work and Task Description Document. *See* [99-7] at Art. IV ¶ A, Art. VI ¶¶ A.1, B.4. The "scope" section does refer to Northrop Grumman advancing toward the Top-Level Performance Objectives, [99-7] at Art. I, but this provision—notably, not found in the payment or obligation section of the agreement—is ambiguous as to whether completion of Top-Level Performance Objectives is required for payment under the Phase III agreement, or whether the Phase III agreement is designed to advance the objectives without necessarily conditioning payment on their achievement. Given these contractual provisions, Northrop Grumman makes a reasonable argument that DHS's payment obligations were based on Northrop Grumman's

completion of the specific milestones through performing the deliverables and the tasks described in the Task Description Document and Statement of Work attached to the Phase III agreement.

The court need not decide whose interpretation is correct because "mere 'differences in interpretation growing out of a disputed legal question' involving the terms of a contract" do not establish an objective falsehood. *Yannacopoulos*, 652 F.3d at 836–37 (quoting in part *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)); *Lamers*, 168 F.3d at 1018 ("[I]mprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA.").

In addition, it is undisputed that at the conclusion of Phase III, Northrop Grumman reported to DHS on the progress made toward each Top-Level Performance Objective, including listing each objective that had not been satisfied and recommending further system improvements. [114] ¶ 34. DHS knew that at least some of the Top-Level Performance Objectives had not been satisfied, yet issued payment for Northrop Grumman meeting the milestone criteria. Under these undisputed facts, Danielides cannot establish that representations based on Northrop Grumman's failure to complete Top-Level Performance Objectives were material falsehoods to obtain payment. "If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required

by the FCA." *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999);

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724,

729 (4th Cir. 2010).[7]

In sum, Danielides's arguments regarding the contractual objectives required

in Phase III boil down to competing contractual interpretations, which do not

establish a knowing falsity by Northrop Grumman.[8]

<u>c.</u> <u>Phase III Financial Reporting</u>

Danielides also argues that Northrop Grumman knew that, under a "fixed

price best efforts" agreement, it was required to provide cost data to allow DHS to

monitor Northrop Grumman's "best efforts" in accomplishing the requisite contract

objectives and that Northrop Grumman failed to provide this information, resulting

in material omissions in its claims for payment. Northrop Grumman argues that

because Phase III payments were based on completion of the milestones, it was not

obligated to report cost data to DHS in Phase III.

---

[7] Danielides has also argued that under his interpretation of "fixed price best efforts," Northrop Grumman was obligated to complete additional objectives found in the Phase III Final Report and Technical Performance Metrics. The only other tasks Danielides specifically identifies are related to Failure Reporting and Corrective Action System (FRACAS) methodology and analyzing remaining data, as described in Northrop Grumman's Phase III Final Report. [124] at 6. Even if these tasks were required under the Phase III agreement, the alleged incompletions were disclosed to DHS in the report and cannot be the basis for an objective falsehood under the FCA.

[8] Even if Flom's opinion on the industry meaning of "fixed price best efforts" were admissible (specifically, that the term requires the expenditure of a specific number of labor hours or budgeted funding during a stated period of time, for a fixed price, or alternatively, the completion of all contracted tasks and objectives), for the reasons stated previously, Flom cannot opine on the overall contractual requirements of the Phase III agreement. Therefore he cannot opine on what were the specific "contracted tasks and objectives" required by this agreement to show that Northrop Grumman's contractual interpretation is, in effect, a cover up for a lie about best efforts.

Northrop Grumman was contractually obligated to provide cost data as a condition of payment, Danielides argues, because the milestone payment amounts were based on estimates developed during negotiations and as part of a time-phased spend plan designed to keep Northrop Grumman "cash positive" during Phase III. In other words, the cost and profit estimations used to set the fixed price for Phase III became tied to Northrop Grumman's milestone payments, so that in order to receive a milestone payment, Northrop Grumman was contractually required to spend funds under its time-phase spend plan (up to Northrop Grumman's guaranteed 12% profit). Therefore, it needed to provide cost data during the life of the contract to show to DHS that it had spent these funds.

Related to this general cost data argument, Danielides says that the Phase III agreement required Monthly Management Reports to include program cost data and earned value monitoring. Northrop Grumman's practice of providing this information in Phase II, Danielides argues, shows that it understood a "fixed price best efforts" agreement to require cost data reporting, and that Northrop Grumman hid this information from DHS.

As a specific example of Northrop Grumman's approach to cost data reporting, Danielides points to an email in April 2008. On the date of a DHS visit to Northrop Grumman's facilities, Northrop Grumman's C-MANPADS program director, David Denton, requested Northrop Grumman's C-MANPADS finance administrator, Donald Eisinger, to generate an up-to-date cost graph, stating "DHS is here and crying." [120] ¶ 21. Eisinger created the graph, but asked Denton why

he wanted to show it to DHS because it showed there was money left over. [120] ¶ 22. Assuming the updated graph was not provided to DHS, at the end of the day, the undisputed facts demonstrate that financial data reporting was not understood by DHS to be a requirement for payment (and was not a material omission of "best efforts" by Northrop Grumman).

DHS knew that Northrop Grumman was not providing financial data, yet went ahead and made the milestone payments. This precludes Danielides from establishing an objective falsehood on the part of Northrop Grumman. It is undisputed that at the conclusion of Phase III, DHS requested additional financial data from Northrop Grumman before making the final milestone payments. Northrop Grumman responded that financial data referenced in the Management Plan was not a deliverable under the Phase III agreement, that the second modification comprising the Phase III agreement (Modification P00008) changed deliverable #19 from Monthly Management Reports to Program Management Reports, and that Northrop Grumman was entitled to payment for meeting the milestone acceptance criteria. After this exchange, DHS believed that Northrop Grumman made a case that these financial data requests were not required under the contract, and DHS issued payment to Northrop Grumman for meeting the final milestones. [114] ¶¶ 27, 55–61; [99-28] ¶ 3; [120-2] ¶ 12. Because DHS knew that financial data was outstanding and paid Northrop Grumman for meeting the milestones anyway, withholding financial data could not have been a "best efforts" lie based on an objective understanding of the Phase III agreement. *See Durcholz*,

189 F.3d at 545. In addition, as previously addressed, neither Northrop Grumman nor DHS shared Danielides's view that the estimated costs and profits during negotiations guaranteed Northrop Grumman a 12% profit, so Danielides cannot establish that the failure to provide cost data was a false statement for payment concealing Northrop Grumman's true "best efforts" profit margin.

Ultimately, this dispute between DHS and Northrop Grumman over whether the Phase III agreement required disclosure of financial data is another dispute of competing contractual interpretation.[9] *See Yannacopoulos*, 652 F.3d at 836; *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 710 (7th Cir. 2015).

Finally, although this motion for summary judgment is directed to the objective falsehood requirement (as identified in the opinion on the motion to dismiss), and discovery was not completed on all issues, there appears to be another problem with Danielides's case. On this record, it also appears that Danielides's FCA action would fail for the reasons identified in *Sanford-Brown, Ltd.*, 788 F.3d

---

[9] In his sur-reply, Danielides argues that he can show that Northrop Grumman lied to the government regarding costs. He refers to portions of his amended complaint alleging that at Denton's direction, in September 2007, Danielides created an inaccurate spend plan graph for DHS, which represented Northrop Grumman's costs as approximately $3 million higher than they actually were and which was presented in a monthly report and design review meeting with DHS. [124] at 7–8. Northrop Grumman admitted that Danielides's spend plan graph was inaccurate and was provided to the government in a monthly report, but denied that Denton instructed Danielides to create an inaccurate graph or that it was presented in a meeting to DHS. [85] ¶¶ 108–109. Danielides's complaint is not sufficient to raise a material issue concerning the graph. Danielides "could not 'rest on the allegations in the pleadings,' but was required to present 'evidentiary material which, if reduced to admissible evidence, may allow him to carry his burden of proof.'" *Yannacopoulos*, 652 F.3d at 823 (quoting in part *Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1299 (7th Cir. 1992)). Danielides waited until his sur-reply to bring up this argument and has not presented any evidentiary material (e.g., affidavits, deposition testimony, or documents), that would allow him to show that this inaccurate graph was a knowing falsity presented to DHS to secure payment.

696. Absent a shared understanding of the contract, Danielides cannot establish Northrop Grumman's "mindset at the time of entry"—specifically, that it entered in the Phase III agreement to defraud DHS and thereafter submit "poisoned" claims for payment. *Id.* at 709. In addition, as described above, Danielides cannot show that demonstrating "best efforts" through financial data was a "condition of payment" under the contract. *See id.* at 709–12.

## IV. Conclusion

A jury could not find that Northrop Grumman made an objective falsehood when it accepted and used the term "fixed price best efforts," and therefore Danielides cannot establish defendant's liability under the FCA. Northrop Grumman's motions for summary judgment, [97], and to exclude the opinion of plaintiff's expert, [101], are granted. Enter judgment in favor of defendant.


ENTER:

Manish S. Shah
United States District Judge

Date: 10/8/15